## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES A. MOORER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.  2:13-cv-2199-SLB |
| | ) | |
| ROOMS TO GO ALABAMA CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is before the court on defendant Rooms to Go Alabama Corp.'s Motion for Summary Judgment. (Doc. 15.)[1] Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (Doc. 15), is due to be denied.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and

---

[1] Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record.  Page numbers for documents refer to the page number assigned by the court's CM/ECF system, except that page numbers for deposition transcripts refer to page numbers of the original deposition transcripts.

show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."

*Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

## II.  STATEMENT OF FACTS[2]

### A. MOORER'S EMPLOYMENT WITH ROOMS TO GO ALABAMA CORP.

Plaintiff James A. Moorer, an African-American male, became an employee of defendant Rooms to Go Alabama Corp., a retail furniture store, at its Hoover, Alabama location in April 2005 and worked as a sales associate until his discharge on May 16, 2012. (Doc. 1 ¶¶ 4, 8-10; Doc. 17-1 ¶ 1.) Elliot Kalick, the Vice President of Rooms to Go Alabama Corp., was responsible for hiring and discharging sales associates during plaintiff's employment,[3] (Doc. 17-5 ¶ 3), and Scott Fleisig, a Store Manager and an Assistant Manager, worked with plaintiff, (Doc. 17-1 at 173-74). Brenda McDew was a Human Resources Representative during plaintiff's employment period. (*See* Doc. 17-6.)

Defendant employed an "Up" system for greeting customers, whereby a sales associate is "up" to greet a customer when it is his turn, and then the next sales associate becomes "up" when the next customer enters the store. (Doc. 17-1 at 72-77; Doc. 17-4 ¶ 1.) On May 5, 2012, plaintiff assisted a customer for whom he was "up." (Doc. 17-1 at 83, 235.) After the customer asked for time to look, plaintiff left the customer, and another sales

---

[2] As required when determining a motion for summary judgment, the court has construed the facts in the light most favorable to plaintiff, the non-moving party.

[3] Plaintiff disputes this assertion insofar as it relates to his termination. He claims that Scott Fleisig, plaintiff's manager, and not Kalick, played the main role in terminating plaintiff's employment. (Doc. 19 at 1.) This issue is addressed below.

associate, Ryan Files (a white employee), began working with the customer. (*Id.* at 236.)
Plaintiff paged Files to get him away from the customer, and Files walked away, but he
returned and "crashed" the customer after plaintiff resumed working with the customer. (*Id.*
at 83-84.) The customer made a purchase, and plaintiff received the commission. (*Id.* at 84.)
Files talked with Fleisig about the situation, and when Fleisig discussed the situation with
plaintiff on the morning of May 12, 2012,[4] plaintiff asked Fleisig to review the floor rules.
(Doc. 17-3 at 39-40.) Fleisig responded by stating that the company's rule is that the
customer is a Rooms to Go customer, not plaintiff's customer. (*Id.* at 38-39.)

Later on the morning of May 12, 2012, Fleisig held a store meeting, and during the
meeting, plaintiff asked Fleisig to go over the store rules. (Doc. 17-1 at 71-72.) Fleisig asked
the sales associates in the meeting if anyone wanted to review the floor rules, and no one
responded. (*Id.* at 86.) Plaintiff then excused himself and went to the restroom. (*Id.*) After
the meeting, Fleisig called Kalick to discuss plaintiff's leaving the meeting. (Doc. 17-3 at
47.) Defendant contends that the meeting went as follows:

> Mr. Fleisig . . . was running the meeting, and plaintiff stood up and said "I
> want to go over floor rules." [(Doc. 17-3 at 48.)] Mr. Fleisig responded that
> he had already indicated that they were not going to talk about floor rules
> but that he would make time for it at a future meeting. [(*Id.*)] Plaintiff sat
> down and about 3-5 minutes later, he stood up and said again that he
> wanted to go over floor rules. [(*Id.* at 44, 48.)] Mr. Fleisig again stated that
> they were not going over floor rules, and plaintiff threw his hands up and

---

[4] Fleisig stated that plaintiff refused to answer two pages after Files approached
Fleisig about the customer dispute. (Doc. 17-3 at 37.)

said "Well, then, I'm leaving the meeting." [(*Id.*)] Plaintiff then left the meeting. [(*Id.*)]

(Doc. 16 ¶ 31.) The following day, plaintiff came to work, greeted the first customer, and then Fleisig asked plaintiff to leave work for interrupting the meeting. (Doc. 17-1 at 89.) Plaintiff asked Fleisig for Kalick's number, and Fleisig gave him the number. (*Id.*) However, plaintiff could not reach Kalick then and did not talk with Kalick at any point thereafter. (*Id.* at 90.) Plaintiff contends nothing else occurred when he asked Fleisig for Kalick's number. (*Id.*)

Fleisig again called Kalick to relate his description of this interaction with plaintiff. (Doc. 17-3 at 49.) Fleisig related that plaintiff walked toward Fleisig with clinched fists, and after coming within inches of Fleisig's face, said "Fuck you." (Doc. 17-3 at 34-35, 49.) Fleisig stated that he thought plaintiff was going to hit him. (*Id.* at 33.) There were no witnesses to plaintiff's interaction with Fleisig. (*Id.* at 49.) Fleisig told McDew that he was uncomfortable working with plaintiff because of these actions and that he felt threatened by plaintiff. (*Id.* at 46; Doc. 17-6 ¶ 5.) Kalick discussed the situation with McDew. (Doc. 17-5 ¶ 19; Doc. 17-6 ¶ 4.) McDew then instructed Fleisig to terminate plaintiff, and Kalick told Fleisig how to communicate the decision. (Doc. 17-3 at 71-73; *see* Doc. 17-1 at 241.) Defendant contends that Kalick, with McDew's approval, made the ultimate decision to terminate plaintiff. (Doc. 17-5 ¶ 19; Doc. 17-6 ¶ 6.)

Earlier in the year in which defendant fired him, plaintiff heard his supervisor, Fleisig, say that he planned to "'whitewash the floor,' meaning [according to plaintiff] that

he was going to replace African[-]American employees such as Plaintiff with Caucasian employees." (Doc. 1 ¶ 15; Doc. 17-1 at 113-14.) Plaintiff also heard Fleisig say at that time that "things are going to get a lot better for y'all [allegedly referring to white employees] once we get rid of some of these so-called troublemakers." (Doc. 17-1 at 113.) Defendant uses a written Open Door Policy and an Internal Complaint Procedure for employees to report harassment, discrimination, or other treatment inconsistent with the company's policies, (Doc. 17-6 ¶ 2; *id.* at 8-9, 11-12), and if an employee feels uncomfortable using either approach, the employee can anonymously report problems through an Ethics Hotline, (Doc. 17-6 ¶ 2).[5] However, plaintiff did not report Fleisig to Human Resources or call the company's Ethics Hotline, and he did not record Fleisig's comment. (Doc. 17-1 at 113-15.)

On another occasion, plaintiff's former coworker, whose last name is Winter, told him that a white, female sales associate named Tasha Harwood said "Fuck you" to her supervisor, Fleisig, and was not fired, but plaintiff admitted that the coworker "probably will deny [telling plaintiff about Harwood's statement] to keep her job" and avoid getting in trouble. (Doc. 17-1 at 246-48.) Harwood left a morning meeting without being excused the week before plaintiff left a meeting, (*id.* at 87), because she was ill due to a stomach issue, (Doc. 17-3 at 45-46). Plaintiff heard another white coworker, Dave Dubelle, cursing in a conversation with a manager named Ken Hudson, although plaintiff is not aware of Dubelle

---

[5] While plaintiff disputes the policies' effectiveness, he does not dispute their existence. (*See* Doc. 19 at 2.)

saying anything similar to "Fuck you" in that conversation, (Doc. 17-1 at 138-40), and Dubelle cursed at plaintiff on another occasion, (*id.* at 51-52). Dubelle was not terminated. (*Id.* at 138-39.) Additionally, plaintiff saw Fleisig write up sales for two white, female sales associates, Laura and Tracy, so they could work with new customers, but plaintiff did not see Fleisig help African-American sales associates by writing up their sales. (*Id.* at 94-95.)

Defendant discharged plaintiff on May 16, 2012 "for gross misconduct based on his insubordination in leaving the morning meeting and threatening conduct towards Mr. Fleisig." (Doc. 17-6 ¶ 6.) Fleisig maintains that the insubordinate way in which plaintiff left the meeting, and not just the act of leaving, contributed to his termination. (Doc. 17-3 at 46.) Plaintiff disputes Fleisig's account of the meeting and contends that he merely excused himself to go to the restroom. (Doc. 17-1 at 86.) Plaintiff also disputes the assertion that he used profanity, (Doc. 19 at 3), maintaining that he does not curse and did not curse that day, (Doc. 17-1 at 90-91).

When asked about his role in the decision-making process, Fleisig testified that no one asked for his opinion about whether plaintiff should be fired, he never stated that plaintiff should be fired, and he did not share his thoughts about what action should be taken. (Doc. 17-3 at 71-72.) When asked whether Kalick weighed in on the decision to terminate plaintiff, he stated, "Not to me." (*Id.* at 72.) In its response to Plaintiff's Interrogatory #10, defendant stated that Fleisig, Kalick, and McDew "agreed that plaintiff's employment should be terminated." (Doc. 20-1 at 6.)

Throughout his employment, plaintiff consistently had a high sales record,[6] and defendant admits that plaintiff's job performance did not factor into defendant's decision to discharge plaintiff. (*See* Doc. 17-3 at 33; Doc. 17-6 ¶ 6.) Defendant replaced plaintiff with a white individual with no furniture sales experience but who had sales experience in other areas. (Doc. 1 ¶ 12, Doc. 17-5 ¶ 21.) When the Hoover store opened, fifteen white employees, nine African-American employees, and one Hispanic employee worked for the store as sales associates. (Doc. 17-5 ¶ 7.) In the month defendant discharged plaintiff, seven white sales associates and nine African-American sales associates worked for the store, and as of the filing date of defendant's Motion for Summary Judgment, nine white employees and ten African-American employees worked as sales associates in the Hoover location. (*Id.*)

Plaintiff filed his first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 21, 2012, alleging race and age discrimination. (Doc. 17-1 at 245-46; Doc. 17-2 at 88.) Plaintiff filed his second Charge of Discrimination with the EEOC on October 29, 2012, alleging only race discrimination. (Doc. 1-1 at 1.) Plaintiff then instituted this action asserting that defendant engaged in employment discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964

---

[6] Plaintiff was ranked number one in the region in sales in 2010 and top ten in the country in sales in 2010, for which he received an award at a dinner hosted by the company in Florida. (Doc. 17-1 at 142-43.) Plaintiff was also in the top fifty in the region in delivered sales for seven years. (*Id.* at 144.)

8

and 42 U.S.C. § 1981 by firing plaintiff. (Doc. 1 ¶¶ 1, 10.) Defendant subsequently filed the instant Motion for Summary Judgment. (Doc. 15.)

## B. MOORER'S BANKRUPTCIES

Plaintiff filed Chapter 13 bankruptcy on April 10, 2012, and the Bankruptcy Court for the Northern District of Alabama dismissed plaintiff's bankruptcy case on September 20, 2012 for plaintiff's failure to maintain his plan payments. (Doc. 17-7 at 1.) Plaintiff did not amend his schedule of assets to list his first Charge of Discrimination filed May 21, 2012. (*See* Doc. 17-7.) Plaintiff filed Chapter 13 bankruptcy again on September 30, 2013, and plaintiff's bankruptcy plan was confirmed by the Bankruptcy Court on December 12, 2013. (Doc. 17-10 at 1.) Plaintiff never listed his potential claim against defendant or his Charges of Discrimination on his schedule of assets, and after plaintiff filed a lawsuit against defendant on December 6, 2013, plaintiff never amended his bankruptcy schedule to list the lawsuit as an asset. (*See* Doc. 17-10.) Plaintiff's second bankruptcy case was dismissed on June 11, 2014 for failure to make plan payments. (Doc. 17-10 at 1.)

Plaintiff filed a third Chapter 13 bankruptcy on September 23, 2014, (Doc. 17-12 at 1), and listed this lawsuit, which he valued at $500,000, on his schedule of assets, (*id.* at 20). Defendant's Motion for Summary Judgment was filed on October 24, 2014. (Doc. 15.) Plaintiff's bankruptcy case is still pending. (*Id.* at 1.)

9

### III.  DISCUSSION

Defendant moves for summary judgment arguing that (1) there is no genuine dispute as to any material fact because plaintiff cannot show an inference of race discrimination; defendant has a legitimate, nondiscriminatory reason for discharging plaintiff; and no evidence of pretext exists, and (2) even if a genuine issue of material fact exists, plaintiff's claim is barred by judicial estoppel for plaintiff's failure to amend his 2012 bankruptcy schedule to list his Charge of Discrimination and for his failure to amend his 2013 bankruptcy schedule to list this lawsuit. The court is of the opinion that neither of defendant's arguments entitles defendant to judgment as a matter of law.

### A. DEFENDANT'S FIRST GROUND FOR SUMMARY JUDGMENT

Plaintiff asserts that defendant discharged him because of his race in violation of Title VII and § 1981.[7] Title VII prohibits an employer from "discharg[ing] any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case of race discrimination, a plaintiff may present direct or circumstantial evidence. "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989) (citing *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550,

---

[7] The court will conduct one analysis for both claims, as Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

1558 n.13 (11th Cir. 1988)). Because direct evidence of discrimination is rare, plaintiffs often resort to circumstantial evidence to prove their claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), provides the burden-shifting framework for assessing circumstantial evidence.

> First, a plaintiff must establish a prima facie case of discrimination by showing that:
>
> (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class.

*Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802). If the plaintiff establishes a prima facie case, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). "This intermediate burden is 'exceedingly light.'" *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (quotation omitted). If the employer offers a legitimate, nondiscriminatory reason for the plaintiff's termination, the burden shifts to the plaintiff to produce evidence that the employer's reason is a pretext for illegal discrimination. *Brown*, 597 F.3d at 1174 (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)).

Plaintiff has offered sufficient evidence to make out a prima facie case of race discrimination. As an African American, plaintiff is a member of a protected class. Plaintiff has shown that he was qualified for his position. He has a high sales record with Rooms to Go Alabama Corp., as evidenced by plaintiff ranking number one in the region in sales in

2010 and in the top fifty in delivered sales in the region for seven years. Rooms to Go recognized his achievement of ranking in the top ten in the county in sales in 2010 at a dinner in Florida. Defendant does not claim that it fired plaintiff for any reason related to his job performance. Plaintiff's termination constitutes an adverse employment action, and defendant replaced plaintiff with a white male—an individual outside plaintiff's protected class. Therefore, plaintiff has established a prima facie case.

Plaintiff also tried to show that defendant treated similarly-situated employees outside his protected class more favorably, but his arguments on this point are unavailing. First, plaintiff claims he is similarly situated to Tasha Harwood because he is accused of insubordinately leaving a meeting and saying "Fuck you" to his supervisor, Fleisig, and Harwood left a morning meeting a week prior to plaintiff's termination without asking to be excused and reportedly said "Fuck you" to her supervisor, Fleisig. However, plaintiff is not similarly situated to Harwood because she left the morning meeting due to a stomach illness, while plaintiff had no such health-related reason for leaving. The court will not consider Harwood's alleged statement to Fleisig because the coworker's statement to plaintiff that she heard Harwood use profanity is inadmissible hearsay that likely will not become admissible during trial. Plaintiff admitted that the coworker likely will deny the statement she made to plaintiff to keep her job and avoid getting in trouble. *See Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996), *amended on reh'g on other grounds*,

102 F.3d 1118 ("Pritchard cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial.").

Plaintiff also claims that Dave Dubelle, a white male, engaged in similar conduct to that which plaintiff is accused of committing, but received more favorable treatment in the form of keeping his employment with defendant. Plaintiff points to one instance where Dubelle cursed at him and another where Dubelle cursed in a conversation with a manager, Ken Hudson. Dubelle's cursing at plaintiff, who was a sales associate, is not comparable to plaintiff cursing at his supervisor. Additionally, Dubelle cursing in a conversation with a manager is not comparable to plaintiff cursing at his supervisor, given that plaintiff has no evidence that Dubelle said "Fuck you" or anything similar to his manager, Hudson. Dubelle is not similarly situated to plaintiff based on either occurrence. Nevertheless, despite plaintiff's failure to identify valid comparators, he has established a prima facie case of race discrimination under the *Maynard v. Board of Regents* requirements, as discussed above.[8]

Defendant has met its burden of offering a legitimate, nondiscriminatory reason for terminating plaintiff: defendant asserts that plaintiff left a store meeting in an insubordinate manner and, later, got within inches of his supervisor's face and said "Fuck you." Even if plaintiff did not engage in the alleged conduct, McDew's and Kalick's honest belief that he did satisfies defendant's burden. "The law is clear that, even if a Title VII claimant did not

---

[8] Plaintiff is a member of a protected class, was qualified for his position, suffered an adverse employment action, and was replaced by an individual outside his protected class.

13

in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).

Assuming Kalick and McDew held the honest belief that plaintiff engaged in insubordinate conduct and used profanity, defendant's legitimate, nondiscriminatory reason for terminating plaintiff rebuts plaintiff's prima facie case, which shifts the burden to plaintiff to show that defendant's reason is a pretext for illegal discrimination. Plaintiff argues that defendant's purported reason for his termination is a pretext for discrimination because Fleisig harbored racial animus that led him to falsely accuse plaintiff of certain conduct and then to act as the decisionmaker behind plaintiff's discharge. Plaintiff points to racially discriminatory actions he claims Fleisig took, such as helping two white female sales associates write up orders, so they could spend more time working with new customers. Plaintiff says that, while he saw Fleisig helping two white, female sales associates write up sales, he did not see Fleisig helping African-American associates. However, plaintiff does not state that Fleisig refused to help African-American employees write up sales or that he never provided such help to them. This evidence does not support plaintiff's argument.

Plaintiff also contends that Fleisig demonstrated racial animus by saying that he was going to "whitewash the floor" and that "things are going to get a lot better for y'all once we get rid of some of these so-called troublemakers" earlier in the same year plaintiff's employment was terminated. (*See* Doc. 17-1 at 113-14.) While this evidence presents a very

close question, the court finds that Fleisig's "whitewash" comment, placed in the context of termination by Fleisig's additional statement that "things are going to get a lot better for y'all once we get rid of some of these so-called troublemakers," is sufficient to create a jury question on whether Fleisig possessed racial animus that ultimately led to plaintiff's termination.

To argue that Fleisig was a decisionmaker and Kalick was not, plaintiff relies on an Employee Status Form that recorded plaintiff's termination. Only Fleisig's and McDew's signatures are on the Form, so plaintiff contends Fleisig was an actual decisionmaker, but Kalick was not. The Form designates a spot for the signatures of the department manager, the Vice President, and a member of Human Resources. Fleisig's signature, which the Form required, therefore carries little weight. Kalick's missing signature does not show that he did not make the decision to fire plaintiff,[9] and Fleisig's statement that Kalick did not weigh in *to him* on the decision to fire plaintiff does not show that Kalick did not weigh in at all. Fleisig, Kalick, and McDew all testified that Kalick discussed the situation with Fleisig and McDew and then decided to terminate plaintiff's employment. Plaintiff has not presented evidence sufficient for a reasonable jury to find that Kalick and McDew were not decisionmakers.

---

[9] At oral argument on defendant's Motion, defense counsel stated that Kalick did not sign the Form because he was out of town for a personal reason. However, there is no evidence in the record of the reason Kalick did not sign the Form.

15

However, plaintiff has presented additional evidence that Fleisig may have been a decisionmaker. Plaintiff relies on defendant's response to an interrogatory asking who was involved in the decision to discharge plaintiff, in which defendant stated that "Scott Fleisig, Store Manager, Elliot Kalick, Vice President of Sales, and Brenda McDew, Human Resources, *agreed* that plaintiff's employment should be terminated." (Doc. 20-1 at 6 (emphasis added).) Agreeing that plaintiff should be discharged is not tantamount to having the authority to discharge plaintiff, but defendant's answer to the interrogatory asking for names of individuals involved in the decision to discharge plaintiff creates a jury question on whether Fleisig was a decisionmaker. *See Austin v. Mac-Lean Fogg Co.*, 999 F. Supp. 2d 1254, 1260-61 (N.D. Ala. 2014) (holding that defendant's response to an interrogatory asking "who was involved *in the decision* to discharge [the plaintiff]" created a jury question as to whether the recommenders, Young and Glander, were decisionmakers, where the defendant answered that "[t]he individuals involved in terminating [the plaintiff's] employment include . . . Young and . . . Glander") (emphasis in original).

Even if Fleisig was not the decisionmaker, plaintiff has created a jury question on pretext under the "cat's paw" theory. This theory provides that a plaintiff can show causation between a non-decisionmaker's animus and an adverse employment action if a decisionmaker acted on a biased recommendation by a non-decisionmaker without independently investigating the complaint against the plaintiff. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is

16

using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* (citation omitted).

Courts emphasize the importance of an employer's act of independently investigating a non-decisionmaker's complaint against another employee in deciding whether to apply a cat's paw theory of liability because the investigation can break the causal connection between the non-decisionmaker's animus and the decisionmaker's choice to fire the employee. For example, in *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236 (11th Cir. 1998), the court focused on the decisionmaker's act of meeting with the employee before discharging her: "When the employer makes an effort to determine the employee's side of the story before making a tangible employment decision affecting that employee, . . . it should not be held liable under Title VII for that decision based only on [another] employee's hidden discriminatory motives." *Id.* at 1250. Courts more readily find that a cat's paw theory fails when the employer produces evidence of such an investigation. *See Stimpson*, 186 F.3d at 1332 (finding that cat's paw liability did not apply where the employer conducted a three-day hearing to investigate charges against the employee); *Rudy v. Walter Coke, Inc.*, 21 F. Supp. 3d 1228, 1241-42 (N.D. Ala. May 19, 2014) (holding that interviewing several people other than the recommender and meeting with the plaintiff allowed the employer to escape an application of cat's paw liability).

The court finds that an application of cat's paw liability depends on a question of fact that must be reserved for a jury. While defendant contends that Fleisig did not recommend

plaintiff's termination, the evidence shows that Fleisig reported plaintiff's alleged misconduct, he stated that he felt uncomfortable working with plaintiff after the incident, and Kalick and McDew completely relied on Fleisig's report in deciding to discharge plaintiff. Thus, a jury could find that Fleisig caused plaintiff's termination because, absent his report to the decisionmakers, plaintiff presumably would not have been fired. Importantly, the court has no evidence that Kalick or McDew conducted an independent investigation into Fleisig's complaint against plaintiff. Either of the decisionmakers in this case could have held a meeting with plaintiff to provide him an opportunity to explain the situation, and they could have contacted any one of the employees who attended the morning meeting that plaintiff allegedly left in an insubordinate manner to ask for a third party's interpretation of how plaintiff exited the meeting.

Evidence supporting plaintiff's claim is sparse, with the only evidence of pretext being Fleisig's alleged "whitewash" comment. However, "[i]t has long been established that it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment. It is equally clear that where such issues are presented, the submission of affidavits or depositions is insufficient to support a motion for summary judgment." *Hardin v. Pitney-Bowes, Inc.*, 451 U.S. 1008, 1008-09 (1981). The court finds that a genuine issue of material fact exists as to whether Fleisig harbored racial animus, whether Fleisig was a decisionmaker, and even if he was not, whether Fleisig's potential animus should be imputed

to the decisionmakers, Kalick and McDew, in a way that renders defendant liable to plaintiff. Therefore, summary judgment on this ground is inappropriate.

## B. DEFENDANT'S SECOND GROUND FOR SUMMARY JUDGMENT

Defendant contends that, even if a genuine dispute as to a material facts exists, judicial estoppel bars plaintiff's claims because plaintiff failed to amend his 2012 bankruptcy schedule to list his Charge of Discrimination and his 2013 bankruptcy schedule to list this lawsuit. The court finds that an application of judicial estoppel is not appropriate in this case.

"Judicial estoppel is an equitable doctrine invoked at a court's discretion." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (citing *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). Courts apply judicial estoppel to "protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest." *Id.* (quoting *In re Coastal Plains*, *Inc.*, 179 F.3d 197, 205 (5th Cir. 1999)) (internal quotations omitted). *Burnes* provides two factors to guide courts in assessing judicial estoppel claims: "First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Id.* (quoting *Salomon Smith Barney, Inc. v. Harvey, M.D.*, 260 F.3d 1302, 1308 (11th Cir. 2001)) (internal quotations omitted).

19

It is undisputed that plaintiff took an inconsistent position under oath in two prior bankruptcy proceedings. The "failure to timely amend a Chapter 13 reorganization plan to reflect a pending claim while simultaneously pursuing that claim in another court of law constitutes inconsistent positions under oath." *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1275 (11th Cir. 2010) (citing *Ajaka v. BrooksAmerica Mortg. Corp.*, 453 F.3d 1339, 1344 (11th Cir. 2006)). Plaintiff did not amend his first Chapter 13 bankruptcy schedule to list the Charge of Discrimination filed on May 21, 2012, and plaintiff did not list either that Charge of Discrimination or the Charge plaintiff filed on October 29, 2012 when he filed for Chapter 13 bankruptcy on September 30, 2013.  Plaintiff filed this lawsuit on December 6, 2013, and the bankruptcy court confirmed plaintiff's Chapter 13 plan on December 12, 2013, but plaintiff never amended his schedule of assets to list this lawsuit before the bankruptcy court dismissed plaintiff's case on June 11, 2014 for failure to make plan payments.

The remaining issue is whether plaintiff had the requisite intent to make a mockery of the judicial system. Because judicial estoppel does not apply where a debtor inadvertently failed to disclose a claim to the bankruptcy court, a court must find the requisite intent to manipulate the judicial system. *Burnes*, 291 F.3d at 1286-87 (citing *Am. Nat'l Bank of Jacksonville v. Fed. Dep. Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983)). "[T]he debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their

20

concealment." *Burnes*, 291 F.3d at 1287 (quoting *Coastal Plains*, 179 F.3d at 210) (internal quotations omitted); *see De Leon v. Comcar Indus., Inc.*, 321 F.3d 1289, 1291 (11th Cir. 2003) (applying this rule to Chapter 13 bankruptcy cases). To determine intent, courts look to knowledge of the undisclosed claim and a motive to conceal.

Plaintiff's knowledge of his claims during his first two bankruptcies is undisputed. Plaintiff filed a Charge of Discrimination with the EEOC less than a month and a half after filing his first bankruptcy petition on April 10, 2012, and plaintiff filed this lawsuit six days before the bankruptcy court confirmed his Chapter 13 plan in his second bankruptcy on December 12, 2013. Regarding motive, "a financial motive to secret assets exists under Chapter 13 as well as Chapter 7 because the hiding of assets affects the amount to be discounted and repaid." *De Leon*, 321 F.3d at 1291. While the court may infer a motive to conceal from plaintiff's omissions in the first two Chapter 13 bankruptcy cases, such an inference is not appropriate given the circumstances in this case.

Courts generally find intent when the plaintiff attempts to amend a bankruptcy petition to add a cause of action only *after* an adversary challenges the plaintiff's failure to initially list it. *See De Leon*, 321 F.3d at 1292 (finding motive and applying judicial estoppel where the plaintiff did not amend his bankruptcy schedule to add his potential discrimination claim until after the defendant relied on plaintiff's omission in its motion to dismiss). Here, plaintiff listed this lawsuit in his third Chapter 13 bankruptcy filing before defendant raised a judicial estoppel argument in its Motion for Summary Judgment. *See Ajaka*, 453 F.3d at

1346 (reversing the lower court's grant of summary judgment on judicial estoppel grounds where the plaintiff's attorney told the bankruptcy attorney to amend the plaintiff's schedule "before any defendant . . . raised the prospect of judicial estoppel"); *Young v. City of Mobile*, Civil Action No. 13–00586–KD–B, 2014 WL 3870716, at *3-4 (S.D. Ala. Aug. 7, 2014) (holding that judicial estoppel was not appropriate because the plaintiff "amended his bankruptcy filings before his omission was challenged by the City's motion for summary judgment" and before the court discharged his debt ); *Kunstmann v. Aaron Rents, Inc.*, No. 2:08-cv-01969-KOB, 2014 WL 1388387, at *7 (Apr. 9, 2014) (refusing to dismiss two plaintiffs' claims on judicial estoppel grounds where they "were not 'caught red-handed' and made their amendments on their own initiative"). Additionally, the bankruptcy court dismissed the first two cases for plaintiff's failure to make timely payments, so plaintiff received no financial benefit as a result of the omissions. *See Spann v. Dyncorp Technical Servs., LLC*, 403 F. Supp. 2d 1082, 1089 (M.D. Ala. 2005) (finding that the plaintiff did not receive a benefit warranting judicial estoppel where her bankruptcy case was dismissed a couple of months after the plaintiff filed a Charge of Discrimination with the EEOC).

Given these facts, the court, in its discretion, will not apply judicial estoppel.

## IV. <u>CONCLUSION</u>

Defendant's Motion for Summary Judgment, (Doc. 15), is due to be denied. An order denying defendant's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 20th day of July, 2015.

SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE